## HYACINTH BERNARD dit LAJORE *vs.* the heirs of ANTOINE BOUGARD and others.

*First Circuit.*

Bernard
*vs.*
Bougard.

After a confirmation of a claim to land by the board of land commissioners, under the act of 1820, and patent issued, if competent at all for this court to go behind the patent to settle conflicting claims, it should only be done upon the clearest and most irrefragable proof.

A resulting trust only exists where the actual payment of the purchase money is clearly and distinctly proved. Payment of a part and not the whole, will not raise a resulting trust.

The bill in this case stated, that in January, 1793, Hyacinth Bernard dit Lajore and one Antoine Bougard took possession of and settled a certain tract of land on the north side of the River Raisin, in the county of Monroe, containing five hundred and sixty arpents, being four hundred and eighty-six acres; was taken possession of jointly, and for their joint benefit, and was possessed and used in common. While so possessed, they, at their joint expense and for their mutual benefit, made permanent and extensive improvements. They continued the occupancy and improvements till March 3, 1807, and long subsequently; and the same was by them invariably considered held, improved and enjoyed as their common property. That about the time last aforesaid, they came to a resolution of making a partition, and they agreed to divide the land as follows, viz: the easterly half to complainant, the other to Antoine. Ever after the division, the easterly half was always taken as the separate property of complainant, and treated by both as such.

That from the time of said partition till Antoine's death, complainant occupied and enjoyed the easterly half in his own right, exercised acts of ownership over it, and that his title was never disputed.

That complainant and Antoine being ignorant and not aware of the course to be taken to obtain a confirmation of their title, neglected to prefer their claim, until 1821, when some person advised them to put in their claim; that they did so under the **act of May 11th, 1820**, that they both prepared *to go to De-*

troit for that purpose, but at the suggestion of some one, it

was proposed, to save expense, that the whole lands should be confirmed to one, and that that one should convey to the other.

Accordingly Antoine went to Detroit, made his claim, and had it allowed, and it was confirmed to him by congress; the expense to be defrayed equally. The commissioners acting by virtue of the act of February 21st, 1823, confirmed the claim. Possession continued by complainant until 1829, and that he often called to see if the *patent* had arrived. Before *patent* was received, Antoine died.

That the day previous to his death, in 1828, Antoine called his children, or a part of them, and informed them of complainant's right in the land, and enjoined them to make a deed. Congress confirmed the claim in 1828 or 1829. When the heirs were called upon to make a deed, they did not deny the right of the party, but professed their willingness to make a deed when they should receive the patent.

That after Antoine's death, complainant held and enjoyed the land until sometime in the year 1829, when Antoine, one of the heirs, conceived the design of defrauding; sold or agreed to sell to H. Disbrow, the undivided fifth part of said entire tract of land; that Disbrow had full previous knowledge and notice on the 5th April, 1829. In the deed to Disbrow, it is recited that the patent had not arrived.

That Alexis Bougard also agreed to sell to Disbrow, on the 28th of May, 1829; that Disbrow, with full notice, received a deed, also reciting that the patent had not arrived.

Therese Nuvane and her husband, Alexis dit Plat Nuvane, on the 13th June, 1830, also agreed to sell to Disbrow, with full notice.

Bill charges each of the *heirs* with full knowledge and notice, before selling, or granting their deeds.

Also, charges that Disbrow had full knowledge and notice at the time of contracting, receiving deed or paying money, and accepted of the deed with this knowledge, and stating that Disbrow surreptitiously and illegally got possession of the lands.

That Hyacinth Bernard, as heir, intending to defraud, and having notice thereof, &c., on the 29th February, 1830, made an agreement with Robert Clark, for one-fifth part of the entire, who made a deed therefore.

That Manigue Mernard and her husband John Mune Mernard, with notice, sold to said Clark, their interest, on or about the 4th February, 1830. Deed given.

Bill charges Clark with full notice, at the time of both these purchases.

Charges that in 1829 or 1830, the patent was issued either to the deceased or some one or more of the heirs, but cannot state the particulars of the patent, as the heirs have it. Requires its production.

1. The defendants plead in bar the statute of frauds to all matters, touching the claim of the complainant, not in writing; and,

2. By answer deny all knowledge, belief, &c., of the pretended purchase from the Indians by complainants, and deny the pretended joint occupancy, improvement, and partition; deny all the material allegations contained in the bill; and Clark and Disbrow deny notice, &c., before their purchase of complainant's claim. The defendants, in their answer, insist that Antoine Bougard, senior, alone purchased of the Indians, or otherwise took possession of the whole premises in question, in his own right, and for his exclusive benefit, about the time mentioned in the bill, and continued to occupy the same, either by himself or his tenants, up to 1807, and to the time of his death in 1829; that he claimed the same as his own, and at all times denied the claims of all others.

The cause was heard on bill, answer, and testimony.

A. D. FRASER, solicitor for complainant.

This bill is brought to enforce the execution of a trust, to which the defendants have put in a plea, setting up the statute of frauds, and denying that it was created by writing. The case made by the bill is that of a trust, arising by implication

or construction of law, and is expressly excepted from the operation of the statute relied on, by the 13th section, (*laws of* 1819, *p.* 118;) and may be proved by parol, even in op- position to the answer of the defendants denying the trust. The statute was never held to apply to such a case. *Wray* vs. *Steele,* 2 *Ves. & Beam's,* 388; *Finch* vs. *Finch,* 15 *Ves.,* 45; *Attorney General* vs. *Fowler,* 15 *Vesey,* 90; *Jeremy's Equity,* 88.

The complainant's case does not rest nor depend upon the promise or arrangement between them, as to the manner of forfeiting the title, but rests upon the previous equity of the case. The promise alledged, is only an additional ground of equity. It is the occupation and improvement of the property by the complainant, that constitutes. his equitable title, and gives him a right to confirmation under the several acts of Congress on this subject. *Hutchins* vs. *Mannington,* 1 *Vesey,* 366; *Boyd* vs. *McLean,* 1 *Johns. C. R.,* 582; 2 *P. William's,* 548; 1 *Johns. Cases,* 153; *Deconcher* vs. *Savatier,* 3 *Johns. C. R.,* 216; *Strickland* vs. *Aldridge,* 9 *Ves.,* 518; *Livingston* vs. *Livingston,* 2 *Johns. C. R.,* 539; *Jackson* vs. *Martsdorf,* 11 *Johns. R.,* 96.

If the deceased did not intend to take the deed as a trust, and convey to the complainant, he obtained it in fraud, and, on that ground, he is entitled to have the trust carried into effect, notwithstanding the statute. *Roberts on fraud,* 102; 1 *Comyns' Dig.,* 361, 485; 1 *Madd.,* 239–240, 299.

It is a clear rule, that where A. purchases in the name of B., the former paying the consideration, B. is a mere trustee, notwithstanding the statute of frauds. *Jeremy's Eq.,* 85. So, if an agent locate lands for himself, which he ought to locate for his principal, he is in equity a trustee for his principal. 2 *Cond. Eng. Ch. R.,* 339. It is equally well settled, that all persons coming into possession of trust property, with notice of the trust, shall be considered a trustee, and bound, with respect to that special property, to the execution of the trust. 1 *Cond. Eng. Ch. R.,* 309; 1 *Johns. C. R.,* 566.

H. T. BACKUS, solicitor for defendants.

The defendants insist that the complainant is not entitled to relief;

I. Because the complainant has failed to make out his case as stated in the bill.

II.   Were all the averments in the complainant's bill true, still he could not have the relief prayed for, or indeed any relief, and especially so under the evidence in the case, because neither party acquired any right by Indian purchases. The title and right of the premises was in the United States, by right of sovereignty, and also of cession from the several states. The Indians had no assignable interest, a mere right of personal occupancy, as has been expressly decided. *Johnson vs. McIntosh*, 8 *Wheat.*, 543. Had the Indian right been otherwise, the pretended purchase would be a nullity; for no right or title to real estate could be acquired by parol in the old North-west territory, even prior to the statute of frauds. *Lindsley vs. Coates ;* 1. *Ohio Rep.* 113.   The fundamental ordinance of 1787, *Art.* 1, prescribed the only mode of transferring real estate, or any interest in it.   And the rules of property are the same in equity as at law.   *Gilbert, law of uses,* 39.   Where a deed is necessary, before the statute of frauds, to pass a legal estate, a deed is likewise necessary to pass an equitable estate, and the same formalities are requisite in the case of a will, or other instrument, to pass an equitable estate, as to pass a legal estate.   *Gilbert, law uses,* 7, 7; *Bac. Abrgt. Tit. uses and trusts,* 91; *Adlington vs. Can.,* 3, *Atk.,* 151; 2 *Atk.* 37.

The occupation and possession of either, or any party, was a wrong, a mere trespass on the property of the United States; they were mere wrong doers, and as between those in equal wrong, there is no equity.   2 *Pow. on Cont.,* 150–1.   Any act of either of the parties touching the premises in question, was a mere usurpation, and but for the act of congress of 1807, could by no possibility have been the foundation of any right whatever.

That act is the foundation of all pretense of right in any one.

*Land laws*, 271.   And the right and title of the defendants is
in virtue of that act, and the several acts extending its opera-
tion, and confirming the proceedings of the commissioners.
These acts made that, the foundation of the right which was
before a wrong, a mere naked trespass on the property of the
United States.

This act pointed out the mode by which this mere wrong
(by the mere bounty of the government,) might be made the
foundation of a claim of right, and that right perfected into a
legal title to the premises; but the consummation of this claim
or incohate right in individual cases, depended on the previou
proof of certain facts, to wit: possession, occupation and im-
provement from, or previous to the year 1796, up to the third
of March, 1807.   No possession that did not extend to the
third of March, 1807, nor any possession, &c., after that time,
could be the foundation of any right under the act in question.
Whoever did not, in fact, on the third of March, 1807, occupy,
possess, &c., the land claimed, or claim under some one who
did, had no shadow of right, either equitable or legal, and
could have none.   Of these facts the commissioners were the
judges, and by the terms of the act in question, they were to
determine claims on an *equitable and just basis*.   And of the
existence of the facts requisite to support the right claimed by
any individual, the decision of the commissioners must be
deemed conclusive.   1st. As no right, equitable or legal, could,
by a possibility exist, or be perfected in any one but by the
previous proof of these facts, and by the express term of the
act, none but the commissioners could take this proof.   And
2d.  Because the decision of the commissioners has been con-
firmed by congress, the donors of this mere gratuity.

In the present case, then, the commissioners have decided
and congress has confirmed that decision, that the land in ques-
tion justly and equitably, in the spirit of the act of congress,
belonged to Antoine Bougard, under, and from whom the pre-
sent defendants claim.

And whoever claims the land in question, or any part of it,
*must* deduce that claim through him; not by controverting the

facts on which his, Bougard's, claim and title to the land rests, for that would unsettle the claim itself, and leave it doubtful whether it belongs to any one.

And as to any claim or right, not deduced from, and resting on, not only the validity of the claim and right of Antoine Bougard, but the truth of the facts upon which that claim was confirmed, as required by the act of congress, there is no equity about it. It rests upon the mere fact, has the act of congress been complied with, in relation to that claim? If not, the claim is, for all legal purposes, a void one; for in such a matter, the act of congress is not only the sole foundation of all right, but itself provides the exclusive means of securing such right. *Wilson* vs. *Mason,* 1 *Cranch.*, 101. In other words, if this court can, as to the facts on which the claim itself rests, go behind the decision of the commissioners, and the confirmation of congress, and if they should there find those facts untrue, and that Antoine Bougard had no right to a part of the land in question, because of him, the facts were not true, that gave the right under the act of congress; *cui bono?* the only legal consequence of such a course, and such results, would be to find that one half of the land in question belongs not to the complainant, but to the United States. Not to the complainant, because he has never complied with the requisitions of the act of congress, upon which all right, either legal or equitable, must depend, by presenting and proving his claim, as that act requires. If the United States, in the distribution of their mere gratuities, have been either wronged or deceived, they alone can correct the evil; this court cannot, for the plain reason that the United States have never authorized it to decide upon the facts that entitle to that gratuity; but on the contrary, that duty has been imposed on commissioners of their own appointing, clothed with full power for that purpose, and whose acts in the matter have been confirmed. But again, the acts of congress, giving the right, and the means of consummating that right, have expired by their own limitation; no claim or proof of claim can now be made. Should then, this court distinctly find that the facts necessary to sustain the

original claim of Bougard, never did in truth exist, (or which is the same, that they were true in relation to the complainant,) the claim of the complainant cannot be now established or confirmed in this court, for these reasons: it is obvious this court can make no decree whatever, in favor of the complainant, since, in the construction of statutes, equity follows the law. *Lessees of Talbot* vs. *Simpson, Pet. C. C. R.* 188. And all the cases referred to by complainant, in which a court of chancery has interposed, and gone behind the legal title, is where each party respectively, in relation to his own separate claim, has pursued all the appropriate steps pointed out by the law for the consummation of that claim, (or at least has pretended so to do,) as *Bodly et al* vs. *Taylor,* 2 *Cond. U. S. Rep.,* 227; *Taylor and Quarles* vs. *Brown, Id.* 235.

III. The complainant most clearly then, can found no claim for relief in controverting the facts on which the existence of the right itself depends, that is the subject matter of his claim. By the facts in the case; it is evident that up to the year 1821, when steps were first taken to acquire a legal right to the premises, even Bougard himself had no permanent, much less exclusive, right in the premises; nothing but a mere possibility under the act of congress, dependent on the previous proof of the requisite facts before the commissioners. Up to that time, then, no ground of equitable jurisdiction existed. Both the complainant and Bougard were on equal ground; neither had the legal title, and either might apply for it. From this time, at least not before, all equities must originate, if any exist in the case, for no equity can be built upon a mere equity; an equity can only exist in relation to some legal right. And so is the case made by the complainant, if it be any thing, that in the year 1821, a pretended stipulation or agreement was entered into between him and Bougard, that for their joint benefit, the premises should be claimed and the legal title procured, in the name of Bougard, in trust, to convey one half to the complainant. Of this pretended agreement, the complainant now seeks to compel an execution; to this the defendants, first denying any such pretended agreement, object:

First Circuit.

Bernard
*vs.*
Bougard.

1. That the action of the commissioners, both as to the right and the evidence of the right, is conclusive, and especially so, since the conformation by congress. 7 *Wheat.*, 28, 237; *Strother* vs. *Lucas*, 12 *Pet.*, *U. S. R.*, 413. And this court are in no wise authorized to revise those proceedings, nor by a possibility could such revision be productive of any benefit to the complainant.

2. Had the complainant a valid claim, as against Antoine Bougard or his children, yet the real defendants, Disbrow and Clark, are *bona fide* purchasers without notice, and as such, will be protected, and equity can give no assistance against them. *Frost* vs. *Beckman*, 1 *Johnson, Ch.*, 300; 9 *Ves.*, 24. But had the defendants had full notice of the pretended claim of the complainant, it would in no wise have varied their rights or altered the case, for the claim itself, by complain-ant's own showing, is a mere nullity, and in the language of Lord Mansfield, had the defendants known of it, they would also have known it was void. *Wilson* vs. *Mason*, 1 *Cranch.*, 70, 100. As every man is charged with a knowledge of the law. 1 *John. Ch.*, 516; *Lyon* vs. *Richmond*, 2 *John. Ch.*, 51, 60.

3. If any such agreement as that contended for by the complainant, were in fact made and entered into, yet the same was null and void. 1. As being contrary to the policy of the law, and in fraud of the act of congress, an agreement not only to deceive the commissioners, but to obtain the title to the premises by false pretences and absolute falsehood, and all acts or agreements in *fraudem legis*, or contrary to the policy of the law, are prohibited and void. The *William King*, 2 *Wheat.*, 148, 153; 4 *Pet. U. S. Rep.*, 441; 4 *John. Ch.*, 254; 2 *Ohio*, 510; 6 *John. Rep.*, 194; 8 *John.*, 444. But 2. If the complainant's own story be true, he entered into a stipulation and agreement with Antoine Bougard, to commit, or procure to be committed, actual perjury, in the proof of the claim before the commissioners, and he himself aided in the commission of that positive crime, for as he would now have this court believe, he himself procured witness, (so his bill and evi-

dence state,) to swear that the premises in question, were
the lawful claim of Antoine Bougard, which, by his present
case, he seeks to disprove; and the maxim both of equity and
law is, *ex turpe contractu non oritur actio.* 1 *Bac. Abst.,* 111;
2 *Binn.,* 101, *and cases there referred to;* 4 *Ves. Jr.,* 811; 8
*Ves. Jr.,* 51; 2 *Eq. Ca.* 20; *Gilbert's Eq. Rep.,* 153. And 3.
To any such agreement as that the complainant now seeks to
enforce the defendant's plea, is a conclusive bar, and the same
is void by the statute of frauds. *Stat.* 1820, 112, 425. It is
an express trust, if any thing, by parol, and therefore void.
It is not an implied trust, or a trust in any way resulting by
operation of law; if any thing, it is a direct agreement by
parol, *to create a trust; an attempt to enforce a parol declara-*
tion of a trust. The case contains none of the elements of
an implied or resulting trust. A resulting trust can only exist
where the actual payment of the purchase money is clearly
proved. *Steer* vs. *Steer,* 5 *John. Ch.,* 1. And a payment of
a part, or any thing less than the whole purchase money, will
not raise a resulting trust. 1 *John. Ch.,* 582; 2 *John. Ch.,* 405;
2 *Mad. Ch.,* 112; 3 *Cow.,* 588; 3 *Ves.,* 696; 1 *Ves.,* 366.

But to this the complainant insists, that a trust is to be im-
plied, for the purpose of preventing a fraudulent use of the
statute of frauds. Trusts for that purpose are never implied,
unless *some clear and specific act of fraud is distinctly proved,*
as preventing the execution of a will or other instrument,
creating an estate or declaring a trust. *Roberts on Frauds,*
103; *Thyne* vs. *Thyne,* 1 *Vernon,* 296. But the facts in this
case show no such thing, and if a trust might be implied in
the present case, it might in every one, to the entire prostra-
tion of the statute.

But the complainant further insists that the facts in the case
show the existence and creation of a trust before our statute
of frauds. The fact is not so, and it is untenable as a legal po-
sition; 1st, because prior to our statute of frauds, the legal es-
tate to the premises was not in Antoine Bougard; his right was
a mere equity under the act of Congress, and so was the com-
plainant's, if he had any; no trust, therefore, could, by a pos-

sibility, have existed, for the obvious reason that there was no legal estate to sustain it. But, 2d, if, by a possibility, any could have existed before the legal title vested in Antoine Bougard, yet, not being in writing or declared by writing, even before our statute of frauds, it would have been void; for the rules of property are the same in equity as at law. *Gilbert, Law of Uses*, 39. Trusts are now what uses were before the statute of uses, as was expressly decided on an issue out of chancery, *Lord, Anglesea*, vs. *Lord Altham ; Holt's Rep.*, 736. And both uses and trusts have always been governed by the same rules and the same reasons as legal estates. *Waats* vs. *Ball*, 1 *P. Will.*, 109. For were not the rules of property the same in equity as at law, in the language of all the books, things would be at sea, and there would be the greatest uncertainty. *Banks* vs. *Sutton*, 2 *P. Will.*, 713; 2 *Blackstone's Com.*, 337. Therefore, the rule has ever been, that where a deed or writing was necessary before the statute of frauds, for passing the legal estate, the same formality was necessary to create or declare a use or trust. *Gilbert's L. Uses*, 7; 7 *Bac. Abr. Tit. Uses and Trusts*, 92; 3 *Atk.*, 151; 2 *Atk.*, 37. No legal estate whatever, by the fundamental ordinance, and laws both of the North-west territory and the territory of Michigan, could, at any time, be created or transferred by parol. *Fundamental Ord., Art.* 1; *Lindsey* vs. *Coats*, 1 *Ohio Rep.*, 113. For these reasons, then, any pretended trust prior to the statute of frauds, would be a nullity.

THE CHANCELLOR.—Every material allegation in the bill is fully and positively denied by the answer. The defendants, nine in number, say the complainant never either owned or occupied the said land, or any part or portion thereof; but the children and heirs, on the contrary, say, from their earliest recollection, their father held the entire, exclusive and peaceable possession of the whole tract, as well the pretended eastern as the western portion; that the said Antoine did not, immediately before his death, or at any time, direct them to con-

vey any portion of the tract to the complainant, or admit that he had any interest therein.

Indeed, it is hardly possible that an answer could be made more full and complete to all the material allegations in the bill. The defendants also set up and insist upon the statute of frauds.

Voluminous testimony has been taken on both sides.

The testimony has been carefully considered, and I cannot, from a review of it, come to the conclusion that the claim of the complainant can be sustained.

The complainant relies for the establishment of his claim upon the testimony of Joseph Beauxhomme, Louis Bernard, Louis Morminee, Joseph Drouillard and Louis Louigne.

The testimony of Beauxhomme is, as to admissions made by Bougard, and is inconsistent with itself. He makes Bougard admit that the complainant is entitled to one half, and says still that he said the two acres troubled him, &c.; and it is entirely at variance with the allegations of the bill, that the land was divided and complainant in the possession of the east half. But little weight can be attached to the testimony of Louis Bernard. It is in proof that he had previously alledged, that the present complainant had no interest in the land in question, but that it belonged to him. Louis Morminee testified before the board of land commissioners, that it belonged to Bougard. Drouillard testifies as to the original purchase from the Indians, and says it belonged to both complainant and Bougard. Louis Louigne substantially sustains the last witness, but is manifestly mistaken as to other statements which he makes, and so much so as at least to cast some doubt upon his testimony. There is such discrepancy and so much uncertainty in the showing in this case, that the testimony of the witnesses as to transactions of so ancient a date, should be received with caution.

The testimony of Margaret Rivor and Narcissa Delisle, who have resided near the land for a long time, strongly sustains the answers; they resided near the lands at a very early period, and never saw the complainant at work on the land, or

First Circuit.
Bernard
vs.
Bougard.

heard of his claim. Indeed the proof of any actual occupation by complainant, aside from the admission testified to by Beaux-homme, is very slight. When it is considered that the fact of a separate and distinct possession and occupation of the east half of the tract of land as alledged in the bill for so long a time, and up to a period so recent, must, if true, have been so notorious as to have been capable of clear and positive proof, coupled with the testimony as to the claim of Louis Bernard, that the land belonged to him; and also the testimony of Durocher, that so late as 1821, the complainant claimed the whole of the land, it is difficult to come to the conclusion, from any thing here presented, that the claimant ever had such a possession and occupation of any portion of this land, either joint or several, as would have entitled him to a confirmation by the commissioners, under the act of congress of May, 1820, continuing in force the previous act, of 1807. The claim of the complainant is probably founded on family residence; he was no doubt, occasionally there when a boy. It is true, there is great discrepancy in the testimony.

But after a confirmation and patent, if it is competent at all to go behind it, it should only be done upon the clearest and most irrefragable proof.

The point insisted upon in the argument, that the agreement, or pretended agreement, that both complainant and Bougard would concur in making proof before the commissioners of that which, according to the allegations in the bill, did not exist, to wit: the sole occupation and improvement of this property by Bougard, so as to bring him within the requirements of the act of congress, is immoral, is entitled to weight. The commissioners had no authority to confirm to any except to those who proved themselves to come within the provisions of the act of congress. They have never acted upon any claim or right of this complainant.

If the allegations in the bill are true, the commissioners have been led by false lights, to do an act which they were not authorized to do. And if this conspiracy had not existed, it is possible such facts might have been elicited, as would have

satisfied them that of right, it should have been confirmed to neither the one or the other.

The ground taken by the complainant, in order to avoid the statute of frauds, is, that this is a resulting trust; that the complainant, being actually entitled to the east half, and the title having been vested in Bougard, the complainant may compel the heirs to execute the trust.

From the premises it will be perceived, that, in the view of the Court, this position cannot be sustained.

*First.* It is not sustained by such clear and undoubted proof as should be required in a case like the present, that the complainant was ever entitled to a confirmation of any portion of this trust.

Indeed, from all the facts and circumstances developed in the case, I am inclined to think otherwise.

*Second.* If it were apparent that the complainant would have been entitled to a confirmation, it would still be questionable whether it would come within the rule of an implied or resulting trust.

A resulting trust only exists where the actual payment of the purchase money is clearly and distinctly proved. Payment of a part, or any thing less than the whole, will not raise a resulting trust. *Steere* vs. *Steere*, 5 *Johns. Ch. R.*, 1; *Boyd* vs. *McLean*, 1 *Johns. Ch. R.*, 582.

This was not a purchase. The occupants of these lands could not claim the grant of the government as a matter of strict legal right, although they may have had strong equitable claims. It was rather in the nature of a bounty or gift by the government.

If there was any trust, it was an express trust, and by parol, not evidenced, or pretended so to be, either as to its existence or terms, by any written contract or memorandum whatever, and, to this, the plea of the statute of frauds, as has already been decided in this court, is a conclusive bar.

The existence of a trust may be shown by parol, but there must be some memorandum in writing showing its terms.

From the view I have taken of the case, all that portion of

the proceedings and proofs which relate to the purchase by Clark and Disbrow, with notice, as is alleged, becomes immaterial. If they had notice of the claim of the complainant, it was a notice that he had no valid claim. The bill must be dismissed with costs.

Bill dismissed.